Mr. Smith, we'd be happy to hear from you. May it please the Court. Good morning, Your Honors. There are several arguments that the appellants would like this Court to address. The first is that the district court erred when it granted summer judgment ruling that the dancers were employees rather than independent contractors. The second is that the trial court erred in prohibiting defense counsel from questioning the dancers regarding the fees that they earned and in questioning them regarding their tax return. The third is the district court erred when it narrowed the verdict sheet. And the fourth is that the plaintiffs failed to establish that they were, in fact, in the trade of commerce or that the defendant's business was in the trade of commerce. Regarding the first argument, the plaintiffs in their deposition and in admissions admitted that they did a number of things that does not fit in the employee context. For example, they chose where they wanted to dance. They chose whether they dance at a particular club. They chose what outfits to wear. They chose who they wanted to approach to generate funds. What do you mean by they chose where they wanted to dance? Well, regarding Markline, there are at least two clubs, so they get to pick. Do you want to dance at Fuego? Do you want to dance at Ecstasy? Moreover, there are a number of clubs in the area that they admitted that, yes, we dance at Club A, Club B, and Club C. You can't be an employee of more than one employer, can't you? You certainly can, Your Honor. And in fact, that's one of the issues that we raised, that there were several of the dancers that had other jobs, what they call, classified as their full-time jobs. That doesn't mean that you can't be an employee of several employers simultaneously. There's always going to be one job that probably requires a greater number of hours than another. You certainly can. But in this case, what they did, they had what they called their full-time job. And they, at least one of them, and a couple of them did this, they would leave their full-time job to go to dance. And when questioned to say, well, why would you leave your full-time job, one of them was the manager, I believe, at Family Dollar, she would have somebody fill in her slot to pay to go into this club. So she can make extra money. And when questioned and said, well, why would you do that? She said, well, I got to control my hours at the other club, and I got to make money in ways that I couldn't make at this other job. Which goes into the economic argument, is that they controlled how much money they made. They, as a dancer, would say, okay, I will pay $50 to go in. I'm investing $50 into going into this club. I'm going in Friday or Saturday. But why would you go in on Friday and Saturday? They said those were the money nights. That's when you make the most money on the amount that you invested. Not only that, they've invested in their outfits, they invested in whatever makeups that they put on. These are all the things that they invest in to be able to make some money back. Like I buy a suit because I work at a law firm. I need suits. Does that mean I'm not an employee because I've invested in the suits I need to wear to my work job? No, Judge, I'm not making that argument. What I'm making the argument is that there were a number of factors that the court looked at that doesn't fit in a typical employee. I agree. It may not be despised, but I'm just trying to address each one as you bring them up. A lot of people invest in wardrobe, what we call it, dress. I've never been on a job where they pay for my suit. I totally agree with you on the outfit. But in a situation like this where they have multiple outfits, where they decide, hey, I want to wear this outfit for this portion of my routine, this portion of my routine for this outfit. They got to make all those choices. The only choice that the club made is say we open for this hours, we close on this hour. Yes, the club does have control because they do pay to keep the lights on and so forth. But the dancers also have a number of things that they do. So your argument basically is that your client only provided a commercial venue for them to dance. Artistic expression for money. Correct. And here's what the dancers, the choices that they got to make. When they got into that club, they invest their money to get in. When they get in, for example, they decide how many lap dance they're going to give. They decide do I dance in the VIP section. They decide do I dance in the VIP area. And all those decisions will accumulate how much money they make at the end of the night. Furthermore, two of the dancers testified. For example, one said, okay, I just started. And she testified that she make an approximately $200 to $300 per night. A dancer who had been dancing for approximately 17 years testified that I make $1,000 to $2,000 per night on a weekend. And I'm comparing and contrasting that to where this court found, I believe in Schultz, that the security officers only could improve or increase their income by working overtime. In this situation, the dancers has control over whether or not they... A great number of courts, a great majority of courts across the country concluded that individuals or plaintiffs in the circumstances of these plaintiffs were in fact employees. There are a number of cases that have come up primarily in the district courts. The circumstances and the totality of factors seem somewhat similar to those here. They were certainly dealing with exotic dancers. A great majority of the courts come down and say there's an employment relationship here. I would agree. But in all of those... It would be sort of creating a counter current or we'd be an outlier or creating a conflict? No, Judge. Not all the district courts have ruled that dancers are employees. The great majority. I would agree that the great majority has. However, the facts all should control whether or not a dancer is an employee or exotic dancer. And in this particular case, in the case of, for example, Circle C and in the case of New York, in those situations the club controlled a great majority of what happened. They told them what to wear. They actually had a salon where they told the dancers you need to get your hair done here. You can't wear your own hair. You need to wear a wig in this particular fashion. You can't wear glitter. You can't do X, Y, and Z. In this situation, the facts are different. In this situation, the club basically gave them no instruction. We open here. If you come in between 6 and 8, there's no charge. How are the hours set? They set their hours. They testified that they set their hours. The only thing the club did was set the hour. No, Judge. The dancers pick their hours. The club says we are open from 6 to 6. If you come in between 6 and 8, there's no charge. That's an incentive. If you come in between 8 and 10, it's, for example, $30. If you come in between 12... The appellee's brief on page 11 says that the defendants set regular schedules for the dancers specifying certain days of the week and certain hours. If you would look at Helen's brief, you would see where the dancers' own testimony. That's one of the issues that we raised with the district court. There were disputes. Some dancers, there's a few of them that said, yes, they set my hours at first. There were many of them who said, no, I came whenever I wanted to. Our argument is that because there was such... The employer listens to the employee if the employee says, you know, I'd like to work remotely one day a week or I wonder if I could have an 8 to 4 schedule rather than a 9 to 5 schedule. A good employer tries to be flexible within the demands of the business to accommodate the hourly and the working preferences of those who work for them. But that doesn't... That wouldn't take them out of an employer-employee relationship. I totally agree with Your Honor's assessment, but that's not what happened in this case. What happened in this case is that the dancers, they decide, for example, they said, I want to work at Club A between 8 and 10 because that's where the crowd is. I want to work at this club between 12 and 3 or 12 and 5 in the morning because this is where the crowd is. This is not a situation where they say, we prefer these hours. This is a situation where they say, this is what we do. We go from club to club each night. A lot of people are always... Plaintiffs are always trying to make themselves into employees and employers are trying to make themselves into independent contractors. For the most part, a lot of people, a lot of parties that are judged to be independent contractors are companies, small companies or whatever, or they're incorporated or what. They don't have to be large companies, but what you're dealing with here are individual dancers. As far as I could tell, they aren't part of a large company. The relationships were negotiated or set on an individual basis. Now, if they'd been all part of an organization that made dancers available and negotiated with companies, that would be one thing, but that's not what impression I got of what happened here. The Fair Labor Standards Act seems to me that one of its purposes was to protect people who didn't have a whole lot of leverage and muscle power on their own. These dancers are on their own. Many of them are probably on the margins. They're not a member of any union. They're not a member of any large company which acts as an agent for them. They seem to me the kind of individuals that are somewhat powerless and occupy a somewhat marginalized place. I thought that the Fair Labor Standards Act was drafted at its core to provide some protection for precisely these sorts of individuals because they have little enough power and leverage on their own. In reality, they have a lot of leverage because they know which club operates at a capacity each night. Part of what they do is that they know that I am investing $50 to make $2,000. Someone who's vulnerable is someone who's making minimum wage and the employee has the ability to say I'm going to not pay you X amount to get you to the minimum wage or cut your overtime and so forth. That's not what we have here. We have people, dancers, who are experienced. They all came in and say we know what the environment, what the status is that we are not being paid. They're also in a position where they're vulnerable to being exploited. You can see this with whether they're given tips and whether they're actually service charges are passed on to them. The company is sometimes a little bit sloppy about keeping records and the rest. It just seemed to me that if the Fair Labor Standards Act doesn't cover this kind of situation, then that strikes me that the drafters of this legislation would be scratching their heads. Well, let me answer your question. I think the Fair Labor Standards Act is there to govern individuals making less than the minimum wage. That's not what we have here. We have dancers who are making $300 a night, $2,000 a night and so forth. Maybe so, but they're still entitled to what they're entitled. I mean, there may be somebody making way over the minimum wage. That person's also entitled to overtime. Fair Labor Standards Act, it's not just the minimum wage standard. Right. It does cover overtime. It covers all sorts of aspects of payment. I'll agree, but what I'm saying is that in these situations where the dancers have control over where they work, who they approach, how they dress, how they manage their skill in earning more than the minimum wage, I don't think the Fair Labor Standards governs that because it governs the individual that's making the minimum wage and individuals who contract around making above minimum wage are not covered by the Fair Labor Standards Act. Thank you, sir. All right. Well, we'll hear the other side of this and I'm going to ask Mr. Greenberg, would you give us your side of it? Good morning, Your Honors, and if it pleases the Court, I'm Greg Greenberg on behalf of the appellees. Your Honors, at its core, we have to look at the case. Could you put that microphone up a little closer to you so I can, I want to hear what you have to say. I apologize, Your Honor. At its core, Your Honor, this case is about this. We have an exotic dance club, in fact, two exotic dance clubs that operate and advertise to the public as exotic dancers and my clients, the plaintiffs, now the appellees, we're the backbone of the business. We are the workers in the business. We are the exotic dancers. So you can't operate the exotic dance club without the exotic dancers. It is, at its core, the most integral part of this business, which is one of the economic realities factors. An independent contractor can't be the core of your business? Your Honor, the economic realities considers a totality of the circumstances. A totality of the circumstances, you got to call it a club, but they don't sell alcohol. They only sell snacks, which I take snacks like chips and bags, stuff like that, no alcohol. Juice and snacks, yes, Your Honor. Juice and snacks. No alcohol. And they have a place. There's a venue. And people come and they dance there. They are independent. See, to me, they're dancers who otherwise get their skills or non-skills from wherever they get them from. They come and dance. That's what the lease is for. You don't become an employee because there's an art exhibit forum where artists come and hang their paintings, and you say, well, you're my employee because I tell you where big paintings have to be on this wall and little ones over here. That doesn't make you an employee. But all you do is display art, and you have consignment, and you make a little money off the ones that are sold. Would you say the artist is an employee of an art gallery that provides space for art? Your Honor, I don't believe your question is on all fours with the incident situation. It has to be on all fours. It's a hypothetical. It normally isn't. It's normally freestanding. Would the artist be an employee of the art gallery? Your Honor, in order to answer your question, I would have to know the totality of the circumstances. I just told you the circumstances. They have a 10,000 square foot space for displaying art. That's all they do. They advertise to the public, art gallery, and artists come there, and they put their paintings up. Dancing is a creative art. It's a performing art. Wait a minute. It's performing art, just like the fine arts are. The fine arts, performing arts. You hang your things up there. You do it for a certain period of time. Then you move it out. I want my artist to be there. Would they be employees? They have chips and snacks, I guess, that people could buy them there, and you decide when you're going to be there to explain your art. Would they be employees under that hypothetical? Your Honor, your point is well taken. I don't make no point. This is a question. Assuming these are highly specialized artists, I would— Let's put them abstract where people don't know what it is. You throw some stuff on the wall. I'm sorry. I didn't mean to be disparaging, but you know how it is. You go to New York, and you put stuff on the wall, and it's big, and people look at it and go, hmm, that's $50,000. The little kid does it. It hangs up on your refrigerator. But what I'm just saying is that— I'm saying, what's that got to do with it, whether or not you're a good artist or a bad artist, or trained or not in terms of the definition of an employee? Would you be an employee? I would submit, to answer that question, if the owner of the gallery suffered or permitted such that it would look like an employee-employee relationship, that yes, that could be an employee-employee relationship. I see how broad your argument is now. Go ahead. In this instance, Your Honor, we would consider the economic realities to look at whether the plaintiffs, the appellees in this case, were in and of themselves at their own business, or were they economically dependent upon the defendants, the appellants, the clubs, in order to perform their work. You said they were? So hairdressers, people who, we colloquially call it do-hair, people who do hair in shops, they are employees of the person who owns the barbershop? I think under certain circumstances they would be, Your Honor, yes. But in this instance, the defendants, the appellants, the clubs, they advertised, by radio, by leaflet, out to the public to attract the business. They set the hours. They, in fact, hired the plaintiffs, the appellees, to perform work duties at the clubs. There was, I mean, I think my colleague makes a good point that you can envision circumstances where somebody is simply providing a commercial venue, and so it wouldn't invariably, these cases are very fact specific, and here they did, it seemed to me, more than just provide a commercial venue. They regulated very specifically what the rules of the relationship were, and they set work schedules, and they had prohibitions on drinking or smoking and loitering, and you couldn't leave the club and return the same night or tomorrow. They didn't take extended breaks. They set the amounts that could be charged. They really, if the critical factor is one of control, these particular companies sought a large measure of control over things that we would recognize were the indicia of the employer-employee relationship, which are work schedules, work hours, deportment while at work, and the amounts that you can charge. These folks fill out application forms. They're subjected to employment interviews. At a certain point, it begins to quack like a duck and walk like a duck and do everything that a duck does, but you don't want to carry any of these things too far because you can certainly imagine people leasing space or providing a venue and not wanting to see the space trashed up or setting some rules for it because leases have rules, but it's a question. The district court felt, well, this was regulating the wages, the hours, the deportment, the hiring process, all of these different factors.  That's got to make it, it's a spectrum. Yes, Your Honor, I think that's absolutely right. It's a spectrum that requires an economic realities analysis of the totality of the circumstance. I would say, Your Honor, in addition to the fact that, yes, there were rules in the record at the time of summary judgment, but what Judge Chazanoff found very compelling and what the other courts have found very compelling and what the administrator's opinion letter which let the Department of Labor get into is that the club set the atmosphere, set who the clientele would be advertised to, set the hours, set the fact that there was a required sign-in and tip-in, set these requirements such that they controlled the club sufficiently that this wasn't just an open venue. They controlled how one would enter the venue, who would be at the venue. These folks are sort of out on their own, aren't they? I mean, they're negotiating individual arrangements with the companies? The record is, yes, that Mr. Ofaya, the owner of both the clubs. But, I mean, they're not represented by agents. They're not members of companies or even closely held, a small corporation. Not at all, Your Honor. Are they members of unions? Not at all, Your Honor. It just seemed to me that they were on their own. They're marginalized. It seems to me they're vulnerable to exploitation in different kinds of ways and the Fair Labor Standards Act ought to speak to that. You know, sometimes you ask yourself, what do the drafters of this statute really want? Do you contend that there was, in this record, exploitation? I contend only that there was an employer-employer relationship. You don't argue that. In this record, we support this exploitation. I would argue that it is exploitive to charge someone to go to work, that there's a requirement under the law. That's what makes it independent contract. That's what independent contractors do. I mean, I think that was the most telling aspect of it. Really, if you look at it, it's to the advantage of the dancers to be independent contractors, because you got your day job, you work, hey, I can go down there, dance a couple hours, I know when the club is hot, a lot of people are there, I dance a couple hours. Look, I can leave when I want. And I go back to work. It's worth it enough to me for somebody to fill in for me at my job job to go down there for three hours to dance and make good money. It's amazing how it's as if you're sheltering someone, but that's a pretty good gig. Really, unless you get behind the prudish aspect of exotic dancing and just say, look, I can leave and make, for example, do you know on this record, how many dances could you do for $30 an hour? How many dances could you do for $30 an hour? Do you know from this record? I don't know from this record, but I would know that the minimum amount that could be received from the dance is set exclusively by the club. The minimum, not max. But that's the minimum. So a person could pay you $100 for the dance, correct? That would be a gratuity. That would be up to the discretion of the customer. It said minimum charge. It didn't say maximum charge. It said minimum. Did it not say minimum? Yes, Your Honor. Well, then that's how you make the rest of it a tip if you go behind. The charge is what you want it to be. It just can't be under $10. You can't change the facts. I'm not trying to change the facts. You are. You said if it was $100, that's a tip. No, it's not. If she says, I want $60 fee for this dance, that does not make the amount above $30 a tip. No, $60, but I'm charging you, and if you give me $65, you'll give me a $5 tip. Your Honor, I... Can you? No, Your Honor, but I think what you're referring to is called in the industry hustling, and the courts have observed that hustling does not factor into profit or loss as it relates to managerial skill. That would go directly to whether the club is advertising sufficiently to the right clientele to bring them in to be able to pay that money. That's solely within the club. Your Honor, I recognize that I've gone over, and there are other issues. Your Honor, if my colleague has further... No, I know. I've taken too much of your time. If you don't mind giving him extra time, I don't have a problem. I know there are other issues on appeal. All I would say to you is, you know, if someone moonlights, that doesn't mean they're automatically not an employee. They may have a part-time job. They may be moonlighting, but if the control is there... Your Honor, if I flip burgers on the weekends or at night at Burger King in order to make some money to supplement what I'm making at the firm, I'm an employee at both places. This is no different. I'd be happy, Your Honor, to answer questions as to the other issues on appeal. We have no further questions, but we would like to hear from Ms. Poe. Your Honor, one last thing, and I apologize. The appellant did note that there was a question as to whether the FLSA applies, whether the defendants were an enterprise engaged in commerce, and I would submit that that argument has been waived. It was not raised at summary judgment. It was not raised in discovery. It's non-jurisdictional, and it was only raised for the first time in the reply brief. I think we understand your view. Thank you. Ms. Poe, let's hear from you. Ms. Poe. Good morning. May it please the Court, I'm Caitlin Poe. I represent the Secretary of Labor. With respect to plaintiff status as an employee. You're representing the Department of Labor? Yes. Okay. With respect to the plaintiff status as employees under the Fair Labor Standards Act, when viewed in light of the broad scope of employment under the FLSA, the totality of the circumstances here do compel the conclusion that the plaintiffs were economically dependent on the defendants rather than being in business for themselves. The plaintiffs here were not independent contractors running their own businesses, the success or failure of which depended on their own business judgment, managerial skills, or initiative. Instead, like many other FLSA employees who do enjoy some flexibility in their scheduling or maybe a lack of tight day-to-day supervision, the plaintiffs were dependent on finding employment in the business of others. Specifically, as this Court recognized in Schultz, the plaintiff's opportunity for profit was not dependent on their managerial skill. And the Court in Schultz explained that there was no opportunity to exercise or even hone managerial skills, and the same is true here. The plaintiffs didn't make decisions about hiring and firing. They didn't develop a marketing strategy or engage in any type of independent managerial skills that would indicate a business. They also risked no loss, as would be true of a true independent business. And as my colleague has explained, the ability to risk no loss. Suppose you left your job for three hours and you had no dancing. I'm sorry? If you left for three hours and didn't have any dances? Right. Well, that's not really risking a loss in the sense of a... No. Why not? The lack of wages for hours not worked is not a loss in the sense of an independent business who has risked capital or has made investment choices, and whether they stand to gain or lose on that. Also, an independent contractor, I didn't know, you have to be an entity beyond just a person. You can't be a sole proprietor. Absolutely you can. I didn't mean to imply you couldn't. I just meant... I didn't think so. No, just an independent contractor, even as an individual, you would expect, as this court pointed out in Schultz, some sort of investment that would indicate that they're an independent contractor, that they're running their own business.  They buy them. That's their independent investment. They make the decision to have a wardrobe. They keep that wardrobe. They do that. No one can control it by themselves. What they dance and what their costumes, that's their wardrobe. That is an investment. To consider the costumes investments, they're minuscule in comparison to the investments made by the defendants in the clubs here, and it is appropriate to compare the investments between the worker and the putative employer when undertaking this analysis because the question, this factor as with all the factors, should be viewed in light of economic dependence. Wouldn't it always be the case if all you're doing is leasing out a venue that you're going to have a higher investment than an independent contractor? I've got a 25,000 square foot art gallery that's in midtown Manhattan. That's going to be a lot of rent I've got to pay. Does that mean that because of inequity in terms of what I paid for the lease space and what the independent contract does, that determines it? It's not determinative. No factor is controlling, but it would be relevant to the extent what the worker or the artist in that instance, we'd want to know what they invested in the production or the hanging of the club, and it is relevant to look at the comparative investments. It does tell us something about economics. One of the things about this area of law that interests me, we have a lot of totality of the circumstances test, but I've almost never seen an area of law that has more circumstances, a greater totality of the circumstances than the independent contractor's employee thing. You look at all these regs and they go through all this and this and this, and I've never seen a situation where there weren't arrows that pointed in both directions. The question is, you know, what's predominant? And the critical question there is control, and these folks sought to maintain a good degree of control over a working relationship. Yes, Your Honor, no one factor is controlling. The factors should be viewed in relation to each other. However, as you've pointed out, the defendants here did exercise a significant amount of control over the manner in which the work was performed, and not only over the dancers themselves for the reasons that have been discussed already, but they also controlled the day-to-day operations of the clubs. They were solely in charge of the advertising. So they controlled the atmosphere of the club and the stream of clientele, which was the key determinant of how the dancers would make money. So they ultimately, by also setting at the very least minimum prices, controlled the key determinant to what these dancers could earn. So we do agree that the control factor demonstrates that the defendants exerted significant control over the manner in which the work was performed, and these flexibilities that I've been pointing out don't convert that economic reality that the plaintiffs were dependent on the employers not running a business of their own. We find it also particularly important that the plaintiffs here needed no special business skills. The parties agree on this, that the dancers didn't even need any special dancing skills. Some did not even have any prior experience before working for defendants. And this factor, as with all the factors looking at economic dependence, is not merely about technical skill. It's about did they have any special business skills that would be exercised in some independent way to indicate that the dancers were truly running their own business. The defendants also were running a business, the sole purpose of which was to attract customers to the club, to view exotic dancers, and the plaintiffs were providing that service. So they were indisputably integral to the defendant's business. And this is important because... If I worked in a venue with all these rules and regulations and respecting my hours and what I could do to work and what I couldn't and what I was going to earn and what was going to be given to me in the way of tips and service charges and what I could do with them and everything, I wouldn't feel very independent. And this doesn't differ a whole lot from a situation where waitresses are employed. That's the only word I can use. Their hours are regulated. They are told what they can and can't do at work. They're told that they can smoke or that they can't smoke. They live significantly on tips and, to some extent, on service charges. And we think of these waitresses as employees. Nobody has ever thought of a waitress as being anything else. And this could tear a big hole in the FLSA. I see my time is up, but if I may respond. I just want to ask if my co-panelists have any more questions. So you equate this to a waitress? We wouldn't equate this to a waitress. It has similarities in that, like a... Like waitresses who are dependent on tips or service charges, courts have recognized that that's true in an FLSA employment relationship, that building customer rapport is a way to increase those tips. But this does not indicate an independent business. It's true of many FLSA-tipped and commissioned employees as well. It doesn't... They only serve their employers food. Clearly a waitress is an employee. They don't have an option to say, well, okay, you can bring in your own sandwiches. They're solely restricted to what the kitchen has there for them to serve. Here, these dancers can dance any way they want to dance. They can... I mean, that's what creative expression is. When they walk in, someone's telling them, tonight I want you to do Marengo or Foxtrot. No, I'm going to do something else because I feel like doing something else tonight. That's what independent... Contractors. They have a lease agreement, they have a venue, and they dance. Now, this has become sort of... because we think there's somebody in the workplace that we need protection of, and the statutes really become more paternalistic. It sounds like it's more paternalistic. That's why I've heard most of them. If you were rich doing this, maybe it would be okay, but maybe if you're not... And that would be nice in terms of if that was your view, but we have to follow the law. The world construes by wit, and the court must construe by the law. So the question is, I don't see any limiting aspect to this. I see a lot of control, and I think the evidence is not clear at all that they have set hours. When they decide to walk off, for example, we know that's not true because if you leave the building, you can't come back in. So if you had hours, you'd say, look, I'm checking out of here because I know if I walk out of the building, I can't come back anyway. What kind of job is that? You ever heard of a job like that? You go on a smoke break, you can't come back in? No. I mean, I just don't... But if it's maternalistic and that's what the Labor Department thinks it is, then I agree. That seems to be the theory. May I respond, Your Honor? Yeah. The test of employment does look at economic dependence, and so the facts here demonstrate that certainly while the plaintiffs may have had some flexibility in their scheduling, there are other undisputed facts that demonstrate that they were dependent on the choices in business management of the defendants. With respect to the leaving and not coming back in, we do believe that's evidence of control because it's essentially a punishment. You can't come back and continue to work. With respect to who the Fair Labor Standards Act protects, it is intended to be broad. The test of sufferer permit is broader than the common law test of control. It specifically rejected that test. So it seems the best thing to do is just not to get too absolute in the thing because there are all kinds of people who engage in creative and artistic work and are still thought to be employees. You take an advertising agency, everybody's engaged in doing artistic drafting of ads or an editorial page cartoonist. That's very creative work, but editorial page cartoonists, some of them are syndicated, but often they're hired by in-house and the draftsmen of ad agencies are often hired in-house. Sometimes they're independent contractors. You don't know. It's just really good to keep it very narrow and fact-specific. It seems like that's what kind of thing Judge Chasnow did and a great majority of courts around the country have done. I don't think that we're going to do global damage to anything, but at any rate. Thank you, Your Honor. We would agree that skills should be looked at in the context that it indicates independence versus dependence. This Court has recognized the test as economic dependence, and if there are no other questions, thank you. We have some rebuttal time, Mr. Wuerst. I mean, excuse me, Mr. Smith. I'm sorry. Your Honor, Pelley is arguing that the club had a great deal of control, and one thing should be clear, the fact that they had some guidelines where the guidelines are actually just enforcing what the state and the county's law says, that's not control. For example, there's rules, no insertion. That's not a control over what goes on that the club is asserting. That's just what the county law says.  They had control because they said these things are prohibited, no smoking, for example. Those are county and state laws. So they're just saying these are the county and state laws. That should not be factored into control over the club. And I think you asked some questions, or the issues were raised about the totality of the circumstances and control. And I would just direct the Court to page 16 of the appellant's brief where Ms. Everett testified that she sold tickets to bring in customers, that she passed out flyers and sold tickets to get more customers for birthday parties at the club. When questioned, well, why would you do that? She said, well, the more customers come in, the more tips that we receive. These are not actions of employees. These are actions of individuals who are investing, who have invested in their business and say, look, I understand I paid $85 or $50 or $30 to come in the club. I need to make my money back. How do I go about that? By putting my photograph on flyers to say, hey, this is where I'm dancing. This is what I look like. Come in the club. The more people come in, the more people see that, the more money that I make. And so it should not be, I think, it's critical that the dancers have control over the aspects of their business. And by being able, this is not a typical situation where the club only had control over advertising. They admit, yes, we do advertise. We go out and we pass out flyers. We even put our photographs on these things. So they're making critical decisions in what they make, how much they make. For example, when they go in, they have to make an assessment. This person is dressed like that. This person has a suit on. How much time do I spend trying to convince this individual, this customer, to go in the VIP room? Because when you go in the VIP room, you make more money. If I just give him a lap dance, that's $10. If I go in the VIP room, this is $35. I get more money. And the question I think you asked, how many lap dance you can do during the hour, those are all assessments that the dancers have to make in deciding how much money they make on the amount that they've invested to come into the club. So this isn't a situation. But an employee can still have considerable discretion. You take a salesman who's given a particular territory, and he's paid a certain wage, and he's also paid on a commission basis. But by and large, he's responsible for developing that territory and deciding which clients he wants to spend time with and this and that. But that salesman is still, even though he has discretion in how he develops his territory, he's still an employee. And anyway, we have 15 factors here, and it seems to me that... I agree with you with the salesman analysis. But I think when you get a little over the edge where you say, okay, is this a WICR, for example, a WICR sales agent? And does he or she control her own schedule? Does he or she advertise on her own or just rely on WICR? And does he or she have a set schedule that she has to come in? And I think once you start looking at that, those are the factors that this district court should have looked at and say, okay, we are getting to the point where they controlled when they can come and go. They controlled how much they even paid to go into the club based on the time that they get there. And like, Judge Gregory, like you said, all the club did was open and say, we have a venue. We have this warehouse where you come in. You decide if you want to come in. You decide how much you want to spend to come in. You decide if you want to go out and stay out for X amount of time. And if you do that, you do understand you have to pay to come back in again. So I think there was ample evidence in front of this court that summary judgment should not have been awarded on the issue of whether or not their employees, they were disputed facts. It's interesting that Applebee's argued, seemed to be arguing that we look at in terms of ability to be independent and business savvy and all those kind of things. But the court wouldn't even allow their tax returns to be submitted. How do we know? For example, they don't have a Schedule C. They file a form, Schedule C, and they have a form where they're quite, rather insulting to say these people are not intelligent. As a matter of fact, it's a pretty intelligent business model, really, because they pay to go there, and they obviously make it work. So we don't know what their tax return shows is whether or not they're independent, whatever, or have business income expenses. I don't know. But it seems to me that would be relevant to that factor, but that was cut off. That was precisely my argument, Your Honor. And then part of that, part of what the district court also prohibited counsel from asking is about, okay, what about the performance fee? How much did you earn in performance fee? And the court cut counsel off from even getting to that point, and even I think I did proffer what question I would have asked when the court prohibited that. And so had the court even allowed that question, then it would have showed that these dancers, A, earn way more than above the minimum wage and therefore the fair labor standards would not apply. But it also would show that they are savage because they have entered into the lease agreement knowing that you're not going to get paid, this is how much you're going to get paid, and anticipate how much money they anticipate making. And in answering one of the questions about the loss, that's part of the calculation that they made. When they pay to have birthday parties, they anticipate that. I'm going to spend X amount on food, but I'm there during the peak hours, so I will make X amount back. And they invite the people for the birthday parties? Yes, Your Honor, that's part of what they do. They invite the clientele, they provide the food for those individual people that they have invited to come there, and they calculate in terms of how much money they're going to make from doing it. It's almost like a catering. Exactly. In a sense. Anything further, sir? I do, but I say I'm over my time, so if there's no further questions, then I would thank the court for hearing from me. Thank you very much. We'll adjourn court and come down and greet counsel. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Roger L. Gregory, Albert Diaz